**2018 UT App 149**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LAMONT STEPHEN VON NIEDERHAUSERN,
Appellant.

Opinion
No. 20160581-CA
Filed August 9, 2018

Fourth District Court, Nephi Department
The Honorable Jennifer A. Brown
No. 141600106

Nathan K. Phelps, Attorney for Appellant

Ryan V. Peters and AnnMarie T. Howard, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1      Defendant Lamont Stephen Von Niederhausern allegedly sexually assaulted his adult daughter, Victim, on four separate occasions. The State charged Defendant with two of the four alleged incidents. At trial, the State moved to introduce evidence of the other two incidents under rule 404(b). The trial court allowed the evidence, despite Defendant's objection, and issued a limiting instruction. The trial court also employed—without objection—a jury instruction based on statutorily undefined terms which the court defined for the purpose of the instruction by using dictionaries. The jury convicted Defendant as charged. Defendant timely appeals, alleging that the trial court abused its discretion by admitting the character evidence and erred in employing dictionary definitions in the additional jury instruction. We affirm.

## BACKGROUND[1]

*Incident One*

¶2    Incident One occurred in December 2011, when Defendant visited Victim's home. During Defendant's visit, Victim fell asleep on the couch in her living room. She awoke to someone kissing her neck in a "very sexual . . . nature" and "assumed it was [her] husband" because it was open mouthed and his tongue was on her neck. He had his left hand pressing on her right rib cage, which was "below [her] breast but . . . touching [her] bra[.]" Upon seeing that it was actually her father touching her, Victim froze in place, completely in shock.

¶3    Soon thereafter, Victim's husband (Husband) entered the room, heard "weird kissing noises," and saw Defendant leaning over Victim with his face down. Husband yelled, "Hey!" and Defendant ran out the door of the house, quickly got into his car, and drove away. Afterward, Defendant stayed away from Victim and her immediate family for approximately eight months.

*Incident Two*

¶4    Incident Two (Count One) occurred in October 2012. Without permission or invitation, Defendant visited Victim's new home, where he spent the night. The next morning, Defendant, Victim, and her children were at the house after Husband had gone to work. Victim heard Defendant speak in a "very low, husky voice, and ask[] her [daughter] if she had her big girl panties on." Victim's eight-year-old daughter was visibly shocked. Victim gave him a "dirty look," and he stopped talking to her daughter in that manner.

---

1. "On appeal from a criminal conviction, we recite the facts from the record in the light most favorable to the jury's verdict." *State v. Pham*, 2015 UT App 233, ¶ 2, 359 P.3d 1284.

¶5    Defendant then got on the computer, purportedly to look for a job, but instead pulled "multiple tabs up with pornographic images and violent animal documentaries." Shortly thereafter, Defendant went up to a bedroom to "take a nap." But instead of sleeping, Defendant began to masturbate. Victim caught him and ordered him to leave the house, but he ignored her request. Later, Defendant approached Victim's six-year-old son and asked "if he had his big boy briefs on" in a "low, husky voice." Victim once again ordered Defendant to leave, and she took her son out of the room.

¶6    Defendant finally acquiesced to the repeated requests for him to leave and slowly took his belongings out to the car. However, once he had packed the final item, he snuck back into the house. Victim became aware that he had returned only after Defendant suddenly pressed against her from behind with his hands on her breasts, thrusting "with his erect penis pushed against her buttocks," kissing the right side of her neck with an open mouth while using his tongue, and grinding against her several times.

¶7    While Defendant sexually assaulted her, Victim froze until she heard her children, who were still in the house. Upon hearing the children, Defendant "whirled around, ran out the open door, jumped into his car," and quickly drove away. Victim began crying and called Husband to relay what had happened. Thereafter, Victim and her family did not see or hear from Defendant for over a year.

*Incident Three*

¶8    Incident Three (Count Two) occurred during a family event on a Saturday in December 2013. Defendant was invited with the understanding that he was to leave directly afterward. However, because it began to snow, Victim and Husband allowed Defendant to stay at their home over the weekend. On Monday morning, after Husband went to work, Victim sat down at her computer with her back to Defendant. Suddenly, Defendant approached Victim, reached around the chair, put his

hands on Victim's breasts, and kissed her neck with an open mouth using his tongue. Victim told him to stop several times, but he became more aggressive. As the abuse escalated, Victim burst out of the chair and went to the kitchen "fuming." She told Defendant that she was going to call Husband and that he needed to leave immediately. Defendant left.

*Incident Four*

¶9    A few days after Incident Three, Victim and her family visited her mother's home to Skype with her sister. When Defendant showed up at the house, Victim left the room that Defendant was in and went into the kitchen. While she was alone in the kitchen, Defendant swiftly approached her and grabbed her from behind. He touched her lower pelvis and breasts and began thrusting against her and kissing her neck.

¶10    Becoming "alarmed that he was bold enough to do this in front of [the] family," she told him to stop, but he became more assertive. He did not stop and when she tried to move away, he grabbed her arms. He started speaking in a "seductive kind of way" to her and she said, "Please let go. Let go of me." He ignored her, so she grabbed a cup of water and dumped it on him. Husband heard her say, "Stop," and, "Let go," and he also saw that Defendant had grabbed ahold of Victim's arm as she attempted to pull away. Additionally, Husband witnessed Victim toss water in Defendant's face. At the same moment that the incident began to de-escalate, Victim's sister called the family on Skype, so Defendant went into the other room to speak with her. When the call ended, Defendant quickly left the house, leaving the door open behind him.

*Summary of Proceedings*

¶11    The State charged Defendant with two counts of class A misdemeanor sexual battery relating to Incidents Two and Three. *See* Utah Code Ann. § 76-9-702.1 (LexisNexis 2017). Both counts were based on Defendant touching Victim's buttocks and/or breasts under circumstances he knew or should have

known would likely cause her affront or alarm. *See id.* Prior to trial, the State moved to present evidence under Rule 404(b) that Defendant had sexually touched Victim on two other occasions: Incidents One and Four. The State argued that the evidence was permissible for the noncharacter purposes of showing context, intent, plan, preparation, motive, knowledge, absence of mistake, or lack of accident, or to complete the narrative and disprove Defendant's claim that the witnesses were fabricating their version of events.

¶12 The trial court held an evidentiary hearing followed by arguments of counsel. In a written ruling, the trial court allowed the State to present evidence of Incidents One and Four, although the State did not bring charges regarding those incidents. The trial court wrote:

> The consistency of grabbing his daughter when he thought others were not watching, of touching her breasts, pressing his pelvis against her buttocks, kissing her neck, and then fleeing when confronted show intent, motive, plan and preparation to commit the crimes charged. This evidence also shows that the defendant . . . knew or should know his conduct would likely cause affront or alarm to his adult daughter.

Prior to any testimony by Victim regarding Incidents One and Four, the judge read a limiting instruction reminding the jury that the evidence was to be used for specific, noncharacter purposes. Before closing arguments, the court read the limiting instruction again.

¶13 The trial court also gave—without objection—a jury instruction based on the statutorily undefined terms "affront" and "alarm," which were defined for purposes of the instruction by using three dictionaries: Black's Law Dictionary, Oxford Dictionary, and Merriam-Webster Dictionary. The jury convicted

Defendant as charged. Defendant timely appeals and we reject his contentions.

ISSUES AND STANDARDS OF REVIEW

¶14    Defendant raises two issues on appeal. First, he argues that the trial court abused its discretion by admitting Incidents One and Four as bad-act evidence against Defendant under rule 404(b) of the Utah Rules of Evidence. We review a trial court's decision to admit evidence under rule 404(b) for abuse of discretion. *See State v. Reece*, 2015 UT 45, ¶ 17, 349 P.3d 712. While case law has previously spoken of a requirement of "scrupulous examination" of evidence and appellate review has often closely examined the reasoning of the trial court in addressing rule 404(b) evidence, our supreme court recently repudiated that standard. *See State v. Thornton*, 2017 UT 9, ¶ 53, 391 P.3d 1016. The court clarified that the correct standard of appellate review regarding evidentiary questions is "whether the district judge made an error in admitting or excluding the evidence in question." *Id.* (emphasis omitted). Said another way, we no longer focus on the path the trial court followed in reaching its conclusion, but review only the conclusion itself. *Id.* ¶ 3 ("[T]he appellate review of evidentiary rulings is on the decision made at trial, not the process by which that decision is reached.").[2]

---

2. We note that at times, Utah case law has described rule 404(b) as an "inclusionary" rule. *See State v. Lowther*, 2017 UT 34, ¶ 30 n.40, 398 P.3d 1032. Our supreme court has repudiated that characterization in favor of looking to "the plain language of rule 404(b) for the standard for the admissibility of evidence: it does not carry with it an attendant presumption of either admissibility or inadmissibility." *Id. But see State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 ("The threshold 404(b) question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper. If it does

(continued…)

¶15    Second, Defendant contends that his defense counsel was ineffective for allowing the crime of sexual battery to be so broadly defined in the jury instructions that Defendant suffered unfair prejudice. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law that we review for correctness." *State v. Charles*, 2011 UT App 291, ¶ 18, 263 P.3d 469.

ANALYSIS

I. Character Evidence

¶16    Defendant asserts that the trial court abused its discretion by admitting evidence of his other two alleged bad acts (Incidents One and Four) under rule 404(b) of the Utah Rules of Evidence. This argument fails. Rule 404(b) provides,

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character. . . . [but] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Utah R. Evid. 404(b). Accordingly, under rule 404(b), evidence of a defendant's bad act is not admissible to prove that "a defendant has a propensity for bad behavior and has acted in conformity with his dubious character." *State v. Burke*, 2011 UT App 168, ¶ 29, 256 P.3d 1102. But bad-act evidence is admissible under rule 404(b) if it is offered for a proper, noncharacter purpose. *See id.* ¶¶ 29–30.

_____

(…continued)

then the evidence is presumptively admissible (subject to rule 402 and 403 analysis).").

¶17　As stated, while our supreme court has clarified that appellate assessment regarding admission of evidence is limited to "whether the district judge made an error" the court also noted that "[t]he careful trial judge will still proceed as outlined in our [previous decisions]—marching through the standards set forth in rules 404(b), 402, and 403, and presenting . . . analysis on the record. And the judge who does so will be better-positioned to have [the] decision on admissibility of prior misconduct evidence affirmed on appeal." *State v. Thornton*, 2017 UT 9, ¶¶ 53–54, 391 P.3d 1016.[3] The evidence "(1) must be offered for a genuine, noncharacter purpose, (2) must be relevant to that noncharacter purpose, and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *State v. Reece*, 2015 UT 45, ¶ 57, 349 P.3d 712 (cleaned up). For the reasons that follow, we conclude that the court did not abuse its discretion in admitting the evidence.

---

3. Significantly, the *Thornton* court expressly repudiated any requirement that a trial court scrupulously examine evidence of other acts. 2017 UT 9, ¶ 44. Indeed, subsequent to *Thornton*, our supreme court held that mechanically applying the so-called *Shickles* factors constituted reversible error. *Lowther*, 2017 UT 34, ¶¶ 1, 21, 34, 45. The court in *Thornton* also appreciated that evidence often provides competing inferences, both proper (noncharacter) and improper (character). Noting that tension, the *Thornton* court stated that under appropriate circumstances, a trial court might conclude that the offered noncharacter purpose is a ruse, but "[s]hort of that, however, the court's job under rule 404(b) is not to balance or weigh competing (proper and improper) inferences." *Thornton*, 2017 UT 9, ¶ 59. This counters earlier decisions in which trial courts were expected to ferret out the predominate purpose. *See, e.g.*, *State v. Verde*, 2012 UT 60, ¶ 17, 296 P.3d 673 (holding that evidence aiming to establish propensity should be excluded despite a "proffered (but unpersuasive) legitimate purpose"), *abrogated by Thornton*, 2017 UT 9.

A.     Noncharacter Purpose

¶18    Here, the trial court appropriately admitted the evidence for at least two[4] different proper, noncharacter purposes: (1) intent and (2) absence of mistake or lack of accident.

1.     Intent

¶19    Evidence is offered for a proper, noncharacter purpose if used to prove intent. *See* Utah R. Evid. 404(b)(2). Here, the two additional incidents, when considered in tandem with the two charged offenses, are relevant to show Defendant's intent. Because sexual battery requires that the defendant not only commit the act of touching, but do so under circumstances that he knows or should know would likely cause affront or alarm, the evidence of the additional two acts is relevant to show Defendant's intent. *See* Utah Code Ann. § 76-9-702.1(1) (LexisNexis 2017) (stating that a defendant commits the crime of sexual battery "under circumstances the actor knows or should know will likely cause affront or alarm to the person touched"); *see also State v. Burke*, 2011 UT App 168, ¶ 30, 256 P.3d 1102 (holding that multiple offenses of sexual misconduct, when considered together, show specific intent and "demonstrate a pattern of conduct related to and arising from that intent").

¶20    Incident One, which occurred while Victim was sound asleep, is evidence that Defendant specifically intended to act upon Victim under circumstances that he knew or should have known would likely cause affront or alarm. The act—touching and licking Victim, his adult daughter, as she slept on the couch—"could reasonably be inferred with a basis in logic and human experience" as evidence of Defendant's intent, since it involved more than just a simple, familial gesture or a harmless

---

4. The State also argues that the evidence is admissible for the purpose of narrative, but since the decision of the trial court can be sustained on the grounds of intent and absence of mistake, we need not address every other possible noncharacter basis.

or accidental physical act. *See State v. Whitaker*, 2016 UT App 104, ¶ 14, 374 P.3d 56 (holding that intent to arouse or gratify sexual desire can reasonably be inferred "with a basis in logic and human experience" from circumstantial evidence). Here, Defendant's acts were overtly sexual in nature. Kissing his adult daughter, licking her neck, and touching her bra all constitute prima facie evidence of the intent to act under circumstances that one knows or should know will likely cause affront or alarm.[5]

¶21    By the same token, Incident Four, which occurred in the kitchen at Victim's mother's house, also demonstrates Defendant's intent to act in a sexual way that he knew would cause affront or alarm. The fact that this incident occurred after the charged events is of no import. Particularly where the State offered bad-acts evidence to show intent, acts committed after the charged events can be relevant.[6] In *United States v. Brugman*,

_____

5. Furthermore, given Victim's reaction, the act demonstrates that Defendant was put on notice that similar conduct, such as the acts committed afterward, would likewise cause affront and alarm to Victim.

6. While it is common to refer to rule 404(b) as pertaining to "prior" bad acts, the plain language of rule 404(b) makes no reference to "prior" crimes, wrongs, or acts, but refers only to "other" crimes, wrongs, or acts. *See* Utah R. Evid. 404(b). Many courts have recognized that other crimes, wrongs, or acts are relevant to the issue of intent, even if those acts occurred after the charged conduct. *See United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995) (noting that the principles governing rule 404(b) bad-acts evidence "are the same whether the conduct occurs before or after the offense charged" (footnote omitted)); *see also United States v. Morsley*, 64 F.3d 907, 911 (4th Cir. 1995); *United States v. Brown*, 923 F.2d 109, 111 (8th Cir. 1991); *Ashe v. Jones*, No. 98-1324, 208 F.3d 212, 2000 WL 263342, at *5 (6th Cir. Feb. 29, 2000); *People v. Dreyer*, 442 N.W.2d 764, 765 (Mich. Ct. App. 1989); *State v. Brown*, 940 P.2d 546, 576 (Wash. 1997) (en banc); *State v. Stuivenga*, No. 52024-5-I, 125 Wash. App. 1048,

(continued…)

364 F.3d 613 (5th Cir. 2004), the court explained, "If an extrinsic act requires the same intent as the charged offense and the jury could reasonably find that the defendant committed the extrinsic act, then the extrinsic act is relevant to [prove a proper, noncharacter purpose]." *See id.* at 620. In this case, while at the house, Defendant waited until he and Victim were alone in the kitchen before forcing himself upon her. The fact that he repeated the unwanted conduct only after he isolated her from the family demonstrates his knowledge that the prior conduct was unwelcome. And the particularly sexualized nature of his behavior is relevant to show the intent of his entire course of conduct. Accordingly, the court properly admitted Defendant's two alleged comparable, repeated acts to show his intent to knowingly touch his daughter in a way that would cause affront or alarm.

2.      Absence of Mistake or Lack of Accident

¶22     While not a stated basis by the trial court for admission, the State asserted at the evidentiary hearing that the evidence of Incidents One and Four should have been admitted to show absence of mistake or lack of accident.[7] Evidence is properly offered for a noncharacter purpose if it is offered to prove the absence of mistake or lack of accident. *See* Utah R. Evid. 404(b)(2); *see also State v. Pedersen*, 2010 UT App 38, ¶ 29, 227 P.3d 1264. This evidence—showing multiple, factually common instances of purposefully touching his daughter's breasts while

_____

(…continued)
2005 WL 487551, at *1 (Wash. Ct. App. Feb. 22, 2005) (per curiam).

7. As explained in *State v. Thornton*, "[a] judge may make the right decision for a mistaken reason (or no reason), for example, and still be affirmed on appeal." 2017 UT 9, ¶ 51, 391 P.3d 1016. We may consider in our analysis any noncharacter purpose proffered by the prosecution even if not one upon which the trial court rested its decision. *Id*. ¶ 55 n.7.

licking her neck—demonstrates that his charged conduct was not a mistake or accident. The two additional incidents are relevant to negate any claims of unintentional or mistaken acts, and there is no indication of unfair prejudice. *See infra* ¶ 24.

B.      Relevance

¶23     As noted in *Thornton*, "[r]elevance is a low bar." 2017 UT 9, ¶ 61. Evidence is relevant if it has "any" tendency to make a fact of consequence more or less probable. Utah R. Evid. 401. Here, Defendant's other two alleged bad acts, showing common facts, are relevant to demonstrate Defendant's intent to cause "affront" or "alarm" to Victim and to show the absence of mistake or lack of accident. *See supra* ¶¶ 19–22. Therefore, the evidence meets the "low bar" of relevance.

C.      Probative Value Compared to Risk of Unfair Prejudice

¶24     Any alleged danger of unfair prejudice suffered by Defendant does not substantially outweigh the probative nature of the evidence. *See* Utah R. Evid. 403. Evidence is only unfairly prejudicial if it creates "an undue tendency to suggest decision on an improper basis." *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989) (cleaned up); *see State v. Burke*, 2011 UT App 168, ¶ 34, 256 P.3d 1102. Here, because the two additional incidents are so similar to, and not any more egregious than, the charged acts, the potential prejudicial effect does not substantially outweigh the probative value of this evidence. *See State v. Reed*, 2000 UT 68, ¶¶ 26, 31, 8 P.3d 1025 (stating that "evidence of multiple acts of similar or identical abuse is unlikely to prejudice a jury" but instead "demonstrates an ongoing behavior pattern which include[s] . . . abuse of the victim"). More to the point, the probative value is significant in establishing (1) intent and (2) absence of mistake or lack of accident, and we see no unfair prejudice—let alone unfair prejudice which substantially outweighs its probative value. Therefore, we cannot say that the trial court should have excluded the evidence under rule 403. Accordingly, the trial court did not exceed its discretion in

admitting the evidence for the noncharacter purposes of showing intent or absence of mistake.

## II. Jury Instructions

¶25 Defendant contends that his trial counsel was ineffective for failing to object when the court approved jury instructions, which, he argues, included prejudicially broad dictionary definitions for "alarm" and "affront."[8] This argument fails because Defendant has not shown the prima facie elements of ineffective assistance of counsel: deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶26 Deficient performance requires demonstration that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.; see also State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (stating that a defendant must "persuad[e] the court that there was *no conceivable tactical basis* for counsel's actions" (cleaned up)). Reasonableness is evaluated from "counsel's

---

8. The relevant jury instructions stated,

> You are instructed that the term "affront" means an insult or indignity; an action or remark that causes outrage or offense or that offends modesty or values. "Insult" refers to an act that offends or shows a lack of respect. "Indignity" refers to an act that hurts someone's dignity; an embarrassing act or occurrence. An "offense" is something that causes a person to be hurt, angry, or upset; something that is wrong or improper.
>
> You are instructed that the term "alarm" means an anxious awareness of danger; something that causes a person to feel frightened, disturbed, or in danger.

perspective at the time," and there are "countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. In the end, "[f]ailure to object to jury instructions that correctly state the law is not deficient performance." *State v. Lee*, 2014 UT App 4, ¶ 22, 318 P.3d 1164.

¶27    Case law demonstrates that use of dictionary definitions in jury instructions is permissible. *See State v. Souza*, 846 P.2d 1313, 1321 (Utah Ct. App. 1993) ("If a dictionary definition sufficiently clarifies an instruction, it should be considered adequate. In fact, Utah appellate courts have themselves compared dictionary definitions to jury instructions to evaluate the clarity of the information given to the jury."); *see also Hi-Country Prop. Rights Group v. Emmer*, 2013 UT 33, ¶ 19, 304 P.3d 851 ("A dictionary is useful in cataloging a range of possible meanings that a statutory term may bear.").

¶28    Based on this precedent, it was acceptable for the court to employ the dictionary definitions of "affront" and "alarm" as "the ordinary meaning of a word" to a "reasonable person familiar with the usage and context . . . in question." *See State v. Hawkins*, 2016 UT App 9, ¶ 35, 366 P.3d 884 (cleaned up). The statutory terms were not ambiguous simply by virtue of not being statutorily defined, and there is no indication that the State attempted to broaden any definitions. The court advised the jurors that if any instruction was stated in multiple ways, they were not to "single out any certain sentence, or any individual point or instruction," but to consider them all "as a whole" regarding "each in the light of all the others."

¶29    Accordingly, Defendant has failed to show that the use of dictionary definitions in Defendant's jury instructions was erroneous and that Defendant's counsel acted deficiently in failing to object. And Defendant's argument on appeal is particularly unpersuasive where Defendant fails to identify, let alone argue, what would have been the legally correct version of the instruction.

¶30 Defendant also fails to show prejudice since an objection to the jury instructions would have surely been unsuccessful, meaning that it would not have made a difference in the outcome of the case. Defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Proof of prejudice must be based on a "demonstrable reality and not a speculative matter." *State v. Chacon*, 962 P.2d 48, 50 (Utah 1998) (cleaned up).

¶31 Even if the court had used more narrow definitions of affront or alarm—or if no definition had been used at all—because of the overwhelming evidence against Defendant and the particularly disturbing acts at issue, it is not reasonably probable that Defendant would have enjoyed a more favorable trial result had his counsel objected to the instructions. Under any definition of affront or alarm, no reasonable jury would conclude that purposefully touching his own adult daughter's breasts, licking her neck with one's tongue, and grinding an erect penis against her buttocks falls outside of any definition of those terms. Thus, because there is not a reasonable probability that objecting to the jury instructions would have yielded a different or more favorable result, Defendant cannot demonstrate prejudice, and his claim of ineffective assistance therefore fails.

CONCLUSION

¶32 We conclude that the trial court did not abuse its discretion by allowing evidence of the two additional bad acts committed by Defendant. We also conclude that Defendant has failed to demonstrate ineffective assistance regarding his defense counsel's failure to object to the dictionary definitions used in the jury instructions. Accordingly, we affirm.

—————